In re John D. RELIGA, Debtor.

Katherine Portolese KELLY, Individually and as Parent and Natural Guardian of Joseph Kelly, Plaintiff,

v.

John D. RELIGA and Daniel E. Brick, Defendants.

Peter Mascaro Construction Co., Inc., Intervenor Defendant.

Bankruptcy No. 91–14029 K.
Adv. No. 92–1030 K.

United States Bankruptcy Court, W.D. New York.

June 10, 1993.

John J. Delmonte, Niagara Falls, NY, for plaintiff.

Richard Hogan, Jr., of counsel to Michael Religa, Niagara Falls, NY, for defendant.

Daniel E. Brick, North Tonawanda, NY, trustee for the Estate of John Religa.

Morree M. Levine, Niagara Falls, NY, for Peter Mascaro Const. Co., Inc.

## MICHAEL J. KAPLAN, Chief Judge.

This case asks whether the fact that monies were provided by a Chapter 7 Debtor's former Mother-in-Law for the construction of the Debtor's marital residence, or the fact that the building contractor who built the residence remains partially unpaid, entitles either the Mother-in-law or the contractor to a constructive trust or equitable lien upon the debtor's interest in the residence. The former Mother-in-Law also seeks a determination of dischargeability as to the amounts she transferred.

The former Mother-in-Law initiated this Adversary Proceeding by Complaint against the Debtor and the Trustee under 11 U.S.C. § 523(a)(2)(A) and § 523(c) and under N.Y. Law. The Building Contractor was given leave to intervene.

The enforceability of certain constructive trusts in bankruptcy was upheld by the Second Circuit in *In re Howard's Appliance Corp.*, 874 F.2d 88 (2d Cir.1989) and *In re Koreag Controle et Revision, S.A.*, 961 F.2d 341 (2d Cir.1992), at least as to personal property. The present action relates to real property; whether 11 U.S.C. § 544(a)(3) [1] disposes of such claims has not yet been addressed by the Circuit.[2] But it is not necessary for the Court to decide the significance of 11 U.S.C. § 544(a)(3) in that regard since the Court finds that State Law does not support the imposition of a constructive trust or equitable lien under the facts at Bar. The Court further finds that any personal obligation to the Plaintiff is discharged.

The proceedings are "core" under 28 U.S.C. § 157.

The matter was fully tried to the Court upon the Plaintiff's Second Amended Complaint. Judgment will be entered in favor of the Debtor and Trustee against Plaintiff Katherine Portolese Kelly and Intervening–Defendant Mascaro Construction Co., Inc.

The Court will examine the issues at some length herein, in light of the number and variety of constructive trust claims being asserted in this Court since the decision of the *Howard's Appliance* case, and the misunderstanding of N.Y. law regarding constructive trusts that is evident in some of those claims.

---

**1.** Section 544(a)(3) grants the Trustee status as a hypothetical bona fide purchaser of the real estate of the Debtor.

**2.** An important subsidiary issue might be presented where, as here, a Notice of Pendency was filed by the Plaintiff before the filing of the bankruptcy petition.

## FINDINGS OF FACT

1. The Debtor (John Religa) was divorced in March of 1991 after sixteen years of marriage. He filed his Chapter 7 petition eight months later.

2. The Plaintiff (Katherine Portolese Kelly) was his Mother-in-Law during those sixteen years, and they have known each other for approximately twenty years.

3. The Debtor has three children, currently ages 14, 7 and 4½.

4. For many years prior to the divorce, the marriage between the Debtor and the Plaintiff's daughter was unstable. The Debtor had left the marital home on at least six occasions over the years. His wife (who is not a party to this action) is described by the debtor to be a "user" of people who must always "get her way," and her mother's comment upon such characterization is that her daughter "*can* get emotional."[3]

5. The Plaintiff was aware of the marital discord. She was aware of the instances in which the Debtor had left the marital home, and indeed on one such occasion the Debtor had gone to stay with the Plaintiff, his Mother-in-Law. (On two other occasions, the Plaintiff had gone to stay with his wife's uncle.) The Plaintiff learned of these separations within a brief period after each occurrence. On one occasion she was instrumental in involving the parish priest in counselling her daughter and son-in-law.

6. The Plaintiff has three other children besides the Debtor's wife—two sons and another daughter. One of the sons, Joseph Kelly, suffers from Downs Syndrome, and functions mentally at a four year old level. He currently is about 32 years old.

7. The Plaintiff is currently about 75 years old.

8. The Plaintiff and the Debtor had an extremely close and loving relationship. The Plaintiff considered herself to be "lucky" to have him as a Son-in-Law.

9. Similarly, the Debtor had an extremely close and loving relationship with Joseph, whom he considered to be more like a brother than a brother-in-law, and who respected and usually obeyed the Debtor.

10. By some time in 1988, the Debtor's wife (the Plaintiff's daughter) had determined that the couple should purchase a larger home. The Debtor initially resisted, then relented, but insisted they look at existing homes and that they not spend more than $90,000.

11. In 1988, the Debtor and his wife owned a home in which they had $32,000 net equity (after costs of sale, as it eventually transpired).

12. By the Debtor's testimony, his wife saw nothing that she liked in the existing home market and determined that the couple should build a new home. Over his objections, but with his knowledge, she purchased a building lot at 896 Elliott Drive, Lewiston, New York. She purchased it in her own name. It was later transferred to them both.

13. The Debtor is a Quality Control Technician at Carborundum Abrasives. He completed one year of college. The Debtor's wife is a Registered Nurse, who, in 1988 apparently worked only part-time.

14. The source of the funds for the purchase of the building lot was a Certificate of Deposit. The Certificate of Deposit originated in a gift to the Plaintiff from the Plaintiff's sister, in approximately 1979. The Plaintiff insists that those funds were the Plaintiff's, although she had placed those funds in the name of her adult daughter (the Debtor's wife) years before, and it was the Debtor and his wife who paid taxes on the interest on the Certificate of Deposit. Not in evidence is whether the wife thought the funds to be hers alone or her mother's, but is clear that the Debtor thought that the monies did belong to his Mother-in-Law, and he objected to his wife

---

3. While those present in Court appeared to "beat around the bush" in describing the Debtor's wife after what counsel on both sides described as a "*particularly* vindictive and vitriolic divorce," it is the Court's impression that the Debtor and his wife's family are fearful of provoking the former wife even though she was not present in Court.

"taking" the money from her mother for a building lot that he felt they should not purchase.[4]

15. The Debtor believed (on the basis of what his wife told him) that his Mother-in-Law "wanted to help" the pair and thus the monies for the purchase of the lot were a gift from the Mother-in-Law; he was opposed to accepting the gift but relented in his wife's wishes.[5] (He believed that the Plaintiff hoped that making his wife happy would solve the marital problems.)

16. Over the years, and on a continuing basis, the Plaintiff had expressed concern to her family about what Joseph's future would be upon her demise. The Debtor had repeatedly assured her that she needn't worry—that Joseph would be "well taken care of" and would be happy.

17. Throughout those years the Plaintiff had expressed to her family her desire that upon her demise, Joseph would live with some member of the family. The Debtor was aware of the Plaintiff's desires in that regard.

18. The Debtor's intentions for his Brother-in-Law Joseph were that Joseph would be placed in a suitable home for physically and mentally disadvantaged persons, would receive substantial attention from the Debtor's family and would spend substantial time with the Debtor's family at the Debtor's family's home. The Debtor never intended to have Joseph reside permanently with the Debtor's family, at least while the Debtor's own children were young, since Joseph could sometimes be violent and otherwise difficult to control.

19. The Debtor never promised his Mother-in-Law, the Plaintiff, that Joseph would be permitted to reside permanently with his family. Conversely, he never told her that he would not so reside.

20. Plaintiff testified that she was repeatedly told by her daughter, the Debtor's former wife, that Joseph would live with her and her husband when the Plaintiff "passed on," and assured her Mother that that was John's (the Debtor's) desire as well.

21. So pervasive was the Plaintiff's belief (fueled by statements of the Daughter) that Joseph would reside in the home of the Debtor, that it became the expectation of all members of the Plaintiff's family. The Debtor never disabused the family of that notion. If the Debtor let the Plaintiff believe that Joseph would eventually live with him, he acted out of some motivation other than a hope or expectation of profit.

22. In early 1989, the Debtor was assured by his wife that the Plaintiff "wanted to help out" further with their lives and would assist them in construction of a new home. The Debtor objected to taking money from the Plaintiff to build a house, just as he had objected to his wife's taking money from the Plaintiff to purchase the building lot earlier. However, the Debtor admits being talked by his wife into building the house, and admits that he then "went along."

23. He felt that he and his wife could afford to build no more than a $90,000 home on the lot (given his belief that the funds for the lot were a gift), without the need for further assistance from the Plaintiff. But he agreed, at his wife's insistence, to signing a building contract for $118,000 and agreed to his wife's dedicating to that contract the $10,000 proceeds of another Certificate of Deposit that was in his wife's name (but which the Plaintiff and Debtor claim was the Plaintiff's money).

24. On July 24, 1989, those proceeds were given to the Debtor for deposit into

---

4. In light of the fact that the Court finds that if any obligation exists in favor of the Plaintiff on the part of the Debtor such obligation is discharged, it is not necessary for the Court to determine whether these funds were or were not in fact a gift to the daughter, unless assets will reach general unsecured creditors and the Trustee objects to any claim filed by the Plaintiff. If so, then the Court will rule.

5. He testified that he was not in favor of building a new home, did not want to pay taxes on a vacant lot, had only one income at the time, and could not expect to pay taxes thereon or to undertake to build a home; he did not approve "taking money from Mother," who, he recites was on a fixed income.

his account and the Debtor remitted them to the home builder to begin construction.

25. Construction of the home occurred from May, 1989 to December, 1989, during which period marital problems worsened. The Debtor's wife committed to approximately $30,000 in upgrades, to which the Debtor consented only to approximately $6,000, and as to much of which the Debtor was misled by his wife regarding whether any upgrades were in fact involved at all.

26. A $77,000 building loan was taken out by the Debtor and his wife, and progress payments were made to the builder by the lender. The former home was sold netting $32,000, also applied to the new home.

27. The new home was approximately 2300 square feet, consisting of four bedrooms, a family room, a kitchen, and dining room, living room, and two and one-half baths. The Debtor testified that each of his three children was to have a bedroom. On the other hand, the Plaintiff claims a specific recall that during construction, the Debtor on one occasion pointed to one of the four bedrooms and said that that was for Joseph.

28. Although not fully paid, the contractor permitted the Debtor and his family to move in in the winter of 1989–90, whereupon marital problems intensified even further as the builder sought further payments.

29. In February of 1990, the Plaintiff knew of the builder's efforts to obtain more money from the Debtor and his wife. She asked the Debtor if there was trouble and whether if she helped out with money would it help the marriage. He answered evasively. Within days he was told by his wife that her mother wanted to help out with their financial problems and help their marriage.

30. The Plaintiff then called the Debtor to come over to her home and specifically asked that he not tell his wife. He visited her and took $6,000 of $7,000 in cash that she offered him for payment to the builder.

31. He claims to have paid $5,000 of that $6,000 to the builder, but the builder denies that payment and the Debtor cannot provide the canceled check or checking account statement.

32. In April of 1990, the Plaintiff transferred $1600 to the Debtor for payment to a different contractor for addition of a concrete patio, which payment was apparently made.

33. At some point in early 1990, the Debtor and his wife agreed with the builder to terms for the satisfaction of the builder's claim for upgrades and the balance of the purchase price of the home. The Debtor's wife borrowed $5,000 from her credit union and they signed a note with the builder for the balance that he was owed.

34. It is not disputed that at no time did the Plaintiff express to the Debtor any intention that the transfers be considered to be loans or express any desire or intention for repayment. The Plaintiff thought them to be (in her words) "an investment in Joseph's future"—not unlike (in the Court's words) a reward or "enticement" in exchange for the Debtor's promise to provide Joseph a place to live after the Plaintiff's demise. Of this the Debtor was unaware, thinking them to be gifts intended to assist the couple in lessening their financial burdens and in his Mother-in-Law's sense of what might help them in overcoming their marital problems.

35. No lawyers were involved in any transactions between Plaintiff and the Debtor, despite the fact that the Plaintiff's nephew is an attorney and the Debtor's brother is an attorney, and despite the fact that the Plaintiff, before retirement, was employed in State Supreme Court where she was exposed to matters involving lawyers and the law. No suggestion was ever made as between the Plaintiff and the Debtor to involve an attorney in the transactions.

36. In July of 1990, the Debtor was "served with papers" establishing that his wife had sued him for divorce, and she left their residence.

37. He informed his Mother-in-Law of this development and told her that the

house would have to be sold and that she would lose the monies that she had "given them" to put into it.

38. The Plaintiff was very upset "with both of them" (the Debtor and her daughter), and was particularly upset with the Debtor's "disavowing" the promise to provide a home for Joseph. She felt that the Debtor was obliged to see to it that her monies somehow were returned to her, in light of the collapse of the marriage.

39. It is undisputed that the Debtor never lied to Plaintiff, did not scheme against her, trick her, was not dishonest or deceitful; and it is not claimed that he lacked honest intention in accepting the funds that she transferred to him. The only complaints that the Plaintiff has of the Debtor are: "John should have alerted me" that divorce was imminent, he should not have "disavowed" his promise to take care of Joseph and should not have "disavowed" what she believes to have been his assurances that "Joey will always have a home with us"; he should have found some way to return the money to her after the collapse of the marriage.

40. The contractor similarly testified that he never had any problem dealing with the Debtor and that he trusted the Debtor.

41. The Debtor informed the contractor of the collapse of the marriage, of the fact that the home would be sold, and of his desire that upon the sale of the home the contractor would be paid, "with interest."

42. The contractor, at some point in late 1990 or in early 1991 contacted an attorney about the possibility of legal action to collect the balance remaining unpaid and left it to the attorney to take appropriate steps. No mechanic's lien was filed; no request was ever made of the Debtor to grant a second mortgage, and no other steps were taken by or on behalf of the contractor to acquire an interest in the real estate.

43. There is no allegation that the Debtor in any way interfered with the contractor, or that he caused the contractor to forego or otherwise to fail to obtain an interest in the real estate.

44. The contractor sued the Debtor and his former wife for the unpaid balance, which action was stayed by the Debtor's filing for relief under Chapter 7 in November of 1991.

### THE PLAINTIFF'S § 523 CLAIM

The Court finds for the Debtor as to the Plaintiff's demands based on fraud.

From the above findings of fact it is clear that the Debtor has engaged in no wrongdoing. Regardless of how the transfers of money from Mrs. Kelly to the Debtor might be characterized, the most serious behavior that could be attributed to the Debtor is a breach of promise. Breaches of promise are the reason that bankruptcy exists. If every breach of promise were non-dischargeable, there would be no reason for any individual to file a bankruptcy case.

There is no suggestion that the Debtor caused the marital discord. Moreover, it was his wife who sought dissolution of the marital relationship. But for the marital discord, he might well have performed *his* understanding of his promise to the Plaintiff, and he might perhaps even have performed *the Plaintiff's* understanding of the promise.[6]

Both the Plaintiff and her other daughter have testified of the Debtor's honesty, his lack of deceit, and their firm conviction that he did not trick, scheme, or lie other than in disavowing his promises once he was sued for divorce. Their disappointment with him stems strictly from his statements and conduct since his marriage fell apart, which was at a time subsequent to the last receipt of any money from Mrs. Kelly.

---

6. The Debtor was never called upon to perform Mrs. Kelly's understanding of the promise, and would not have been called upon until Mrs. Kelly's death were it not for the divorce. (Mrs. Kelly appropriately sued on behalf of Joseph as well as on her own behalf.) Indeed, had Joseph predeceased Mrs. Kelly, the Debtor would not have been called upon at all. (Whether Mrs. Kelly would have sought the return of the money in such event is not in evidence.)

Although counsel for the Plaintiff argues that the Debtor should have stopped taking money from her in light of the marital difficulties, the argument is rejected. To have rejected the monies predicting that the marriage might be irreparable would likely have become a self-fulfilling prophesy.

In the Plaintiff's own words upon the witness stand, the fault here lies "just in the turn of events."

## THE CONTRACTOR'S CLAIMS

■ Although progress payments were made, Mascaro knowingly and wilfully put significant value into the Debtor's home without advance payment therefor and without security for payment. Despite knowing of the Debtor's difficulty in paying him, he did not file a lien even after entering into an installment agreement with the Debtor and his former wife. He further knew from the Debtor's letter to him (which the Debtor was courteous enough to send) advising him of the divorce and the fact that the home would have to be sold, that marital calamity had struck. At no time, however, did this experienced home-builder exercise his [7] rights to "lien" the property, or even to ask the Debtor to grant a lien.

There is no reason for equity to "baby-sit" a home contractor who was paid for the services he provided and who took his chances as to the balance.

The elements of constructive trust are discussed later. No wrongdoing occurred that would give rise to the imposition of a constructive trust in favor of Mascaro; nor duties of trust; nor any promise other than a promise to pay. If the contractor feels that exercise of the Debtor's right to file a bankruptcy petition and to claim a $10,000 homestead (in a home in which the Debtor had built equity in the form of the down-payment, payments upon the mortgage, and other means) results in "unjust enrichment," then his remedy is with his representatives at Congress, for he complains of the justness of the Bankruptcy Laws. The request for equitable lien upon the property lacks the essential element of an intent or understanding to create a lien, as discussed later.

As against the Debtor, the contractor's claims are denied.

The contractor's claims against the Plaintiff need not be resolved in light of the Court's decision, as hereinafter set forth, resolving the Plaintiff's constructive trust and equitable lien claims against the Debtor and the Trustee against Mrs. Kelly.

## MRS. KELLY'S CLAIMS OF CONSTRUCTIVE TRUST AND EQUITABLE LIEN.

On her own behalf, Mrs. Kelly claims an equitable lien. On behalf of Joseph she claims a constructive trust to enforce a life estate in Joseph's favor. She bases these claims upon "unjust enrichment." The question is not whether distributing the proceeds of the house in accordance with the provisions of the Bankruptcy Code and the Declaration of Exemption is less "just" than giving them to Mrs. Kelly. (The result commanded by the Bankruptcy Code is, by definition, "just," for present purposes.) [8]

The question is two-fold, (1) whether Mrs. Kelly or Joseph would have been entitled to the imposition of a constructive trust or an equitable lien under non-bankruptcy law, had there been no bankruptcy and had she sued for such relief; and, if so, (2) would that result violate Federal Bankruptcy Policy.[9]

---

7. Actually "It's." The creditor is a corporation. Mr. Mascaro, however, testified personally.

8. Neither authority nor logic supports the notion that the Court is to compare bankruptcy policy (equality of distribution, "fresh start," etc.) against her plight, when the Court performs an "unjust enrichment" inquiry.

9. See Alan G. Skutt, Annotation, Power of trustee in bankruptcy to defeat rights of beneficiary of constructive trust under § 544(a) of Bankruptcy Code, 96 ALR Fed. 100 (1990), for an examination of constructive trusts within bankruptcy.

Did a constructive trust or equitable lien "attach" before the commencement of the bankruptcy case? It did not.

New York is among an apparent minority of states in which "unjust enrichment," standing alone, is not sufficient to establish a constructive trust: "Generally speaking a constructive trust does not require any agreement between the parties—either actual or express, or implied,—to create a trust," but "in some jurisdictions [New York is one] in order to establish a constructive trust there must have been a promise, either express or implied, as well as a transfer made in reliance of that promise." [10] In New York, the requisites to a constructive trust have been so often stated that they are virtually axiomatic. Four elements must be present: (1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon, *and* (4) unjust enrichment.[11]

In New York, it is the confidential or fiduciary relationship that is thought to be "so 'pregnant with opportunity for abuse and unfairness' as to require equity to intervene and scrutinize the transaction. [Equity is not so invoked where the] absence of a written memorandum of the agreement was not a consequence of their relationship." [12]

The relationship between the constructive trust remedy and the Statute of Frauds is not clear, but it is an amicable one. A close relationship among persons might logically lead them to dispense with the need to reduce their understanding to writing. And the notion that there be some "promise" to be enforced between them, as opposed to a mere "understanding," lends itself to the contract analysis. The well-settled exception to the "Statute of Frauds" for matters that are found to be the subject of constructive trust can be said, then, to be based in the notion that oral contracts among persons in confidential relationships should be enforced despite the Statute of Frauds.[13] N.Y. G.O.L. § 5–701 (McKinney 1993).

In the *Sharp* case itself, the Court advised that it is the existence of a confidential relationship that triggers the equitable considerations leading to the imposition of a constructive trust, for it charges the defendant with an obligation not to abuse the trust. Addressing the second requirement, the Court stated that even without an express promise, courts of equity may impose a constructive trust upon property that is transferred in reliance upon a confidential relationship, for a promise may be implied or inferred from the very transaction itself.[14]

In the case at bar it is not disputed that there was a family relationship between the Plaintiff and the Debtor which satisfies the first requirement of the test.

The Court will assume, for the sake of argument, that the Debtor is chargeable with having made a promise to the Plaintiff that Joseph would have a home with the Debtor's family.[15] This assumption is use-

---

10. 76 Am.Jur.2d Trusts § 210 (1992).

11. Most often cited for this proposition is *Sharp v. Kosmalski*, 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976). It was so cited in, for example, *Lefton v. Bedell*, 160 A.D.2d 702, 553 N.Y.S.2d 783 (1990); *Ladone v. Ladone*, 121 A.D.2d 512, 503 N.Y.S.2d 831 (1986); *Bontecou v. Goldman*, 103 A.D.2d 732, 477 N.Y.S.2d 192 (App.Div.1984); *Lester v. Zimmer*, 147 A.D.2d 340, 542 N.Y.S.2d 855 (1989). The cases to this effect are legion.

12. *Bontecou* 477 N.Y.S.2d at 195, quoting from the *Sharp* case, *supra*, and citing as well, *Sinclair v. Purdy*, 235 N.Y. 245, 139 N.E. 255 (1923).

13. Constructive trusts are seen to play a role in matrimonial disputes, decedent's estates, taxation and torts, as well as contracts.

14. *Sharp v. Kosmalski*, 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976).

15. The failure of the Plaintiff to produce her daughter, the Debtor's ex-wife, as a witness at trial, gives rise to an inference adverse to the Plaintiff, in the mind of this Court. As a consequence, the Court is not prepared to find that the Debtor is chargeable with the type of "promise by silent acquiescence" that is described in detail in the case of *Djamoos v. Djamoos*, 153 A.D.2d 871, 545 N.Y.S.2d 596 (1989): "With respect to the second element of a promise express or implied, the Plaintiff clearly and unequivocally testified to family discussions that the Defendant would reconvey title to the house in question to the Mother; he asserted everyone believed the house would be reconveyed, and that there was no discussion of what the bank

ful to further analysis of the law governing constructive trusts in cases like this, which analysis leads to the basis for today's decision. The Court holds that a constructive trust is not created where the land sought to be imposed with a constructive trust is merely incidental and even irrelevant to the promise alleged to give rise to the trust.

Among the many ways of categorizing the cases examining the imposition of constructive trusts upon lands is the distinction between the "reconveyance cases" and other cases. The reconveyances cases are those in which the party seeking to impose the constructive trust is, or takes through, the prior owner or interest holder, who relinquished an interest in the very land upon which constructive trust is sought, and who did so in reliance upon the grantee's promise regarding future use or disposition of the land.[16]

The "reconveyance" cases are rather straightforward.[17] The *Sharp* case itself (see footnote 11 above) was a "reconveyance case."[18] The "promise" regarding

would do upon reconveyance from the Defendant. The Trial Court ... placed too much emphasis on the absence of any further discussions concerning ownership or reconveyance ... In confidential family relationships, mutual understanding does not always depend upon words expressly uttered, and silence in the presence of conditional assertions may constitute tacit consent and a promise to comply with the conditions ... Moreover, a trust which is originally dependent upon word of mouth for proof of its existence may be confirmed by part performance thereunder." [Citations omitted.] See also *Trustees of Amherst College v. Ritch,* 151 N.Y. 282, 45 N.E. 876 (1897), "While a promise is essential, it need not be expressly made, for active co-operation or silent acquiescence may have the same effect as an express promise. If a legatee knows what the testator expects of him, and, having an opportunity to speak, says nothing, it may be equivalent to a promise, provided the testator acts upon it. Whenever it appears that the testator was prevented from action by the action or silence of an legatee, who knew the facts in time to act, or speak, he will not be permitted to apply the legacy to his own use when that would defeat the expectations of the testator ... Where ... the legatee, even by silent acquiescence, encourages the testatrix to make a bequest to him, to be by him applied for the benefit of others, it has all the force and effect of an express promise." *Amherst,* at 324, 45 N.E. 876.

In the case presently at Bar, no party objected to the offering of hearsay statements made by the Debtor's former wife to her own mother and to other members of her family regarding the Debtor's wishes and desires concerning his brother-in-law Joseph. The Court concludes from the Plaintiff's failure to produce her daughter that the Plaintiff failed to establish that the Debtor had made to her, even by silent acquiescence, the promise she claims—the promise that Joseph would have a home with the Debtor's family upon the Plaintiff's demise. But the Court does not rely upon that finding for its decision.

16. "Resulting trust" cases are a distinct subcategory of "other" constructive trust cases in that they generally seem to relate specifically to instances in which money is given by A to B to purchase land for A, but B instead purchases it in B's own name. Assuming this simple hypothetical to be the paradigmatic cases of "resulting trust," no allegation of "resulting trust" is made here. There is no question but that the land and all of its appurtenances were to be acquired in the name of the Debtor and his former wife, rather than in the name of the Plaintiff, and that the Plaintiff contemplated no interest or estate in the land at the time it was acquired or in the manner in which it was acquired.

17. Thus, for example, a daughter conveyed her interest in real estate to her father "under the mistaken impression that she could unilaterally claim her interest," and she made that conveyance after she was a "victim of a violent crime" upon the premises. Her father died and she sought from her father's estate the re-transfer of her 50% interest in property. Despite a vigorous dissent, the majority held that "to deprive her of the property under the circumstances would be inequitable and would unjustly enrich the estate." *The Matter of Wieczorek,* 186 A.D.2d 204, 587 N.Y.S.2d 755 (1992).

18. The Plaintiff was a 56 year old dairy farmer, uneducated, who became a widower after thirty-two years of marriage. He developed a very close relationship with a school teacher sixteen years his junior. Though she refused his repeated proposals of marriage, she accepted his many gifts, including access to his bank account and, eventually, the deed to his farm. A year and a half after that transfer, she ordered him off the farm and left him with total assets of $300. Reversing the trial court which found that his transfer of the farm had been made without a promise or understanding of any kind and was a mere gift, the Court stated that the relationship between the Plaintiff and the Defendant was of such a nature as to invoke consideration of the equitable remedy of constructive trust. It remanded for a further examination of the facts, in light of its holding that the trial court had erred in labeling "a legal conclusion" as a "finding of fact"—to wit, that the

the use or disposition of the land which the Court of Appeals seemed to have perceived in that case is suggested in the following: "In the case before us, it is inconceivable that plaintiff would convey all of his interest in property which was not only his abode but the very means of his livelihood without at least *tacit consent upon the part of the defendant that she would permit him to continue to live on and operate the farm. The Court would therefore reject the Trial Judge's conclusion, erroneously termed a finding of fact, that no agreement or limitation may, as a matter of law, be implied from the circumstances surrounding the transfer of plaintiff's farm." [19]* *Sharp* 386 N.Y.S.2d at 75–76, 351 N.E.2d at 724.

The reconveyance cases involve a promise (the second element of constructive trust) to reconvey some interest in the very same property that is parted with (the third element).[20]

Some courts appear to have been of the view that constructive trust is a remedy available in the State of New York *only* with regard to *reconveyance-type* cases,[21] and that proposition has received some application that is rather absolute.[22] But other courts were somewhat more flexible in this regard.[23]

Defendant was not unjustly enriched. The Court stated

> "the conveyance herein should be interpreted 'not literally or irrespective of its setting, but sensibly and broadly with all its human implications.' This case seems to present the classic example of a situation where equity should intervene to scrutinize a transaction pregnant with opportunity for abuse and unfairness. It was for just this type of case that there evolved equitable principles and remedies to prevent injustices. Equity still lives. To suffer the hands of equity to be bound by misnamed 'findings of fact' which are actually conclusions of law and legal inferences drawn from the fact is to ignore and render impotent the rich and vital impact of equity on the common law and, perforce, permit injustice. Universality of law requires equity."

*Sharp* 386 N.Y.S.2d at 76, 351 N.E.2d at 724.

**19.** Presumably the unequivocal refusals of the Defendant in the *Sharp* case to marry the Plaintiff takes the case out of the subcategory of constructive trust cases known as the "marriage" cases, in which it is the promise to marry that is the motivating factor in the initial conveyance. Such cases led to widely disparate results in different states and under different circumstances regarding the failure of the engagement or the marriage, and led to legislation in most jurisdictions.

**20.** In another case *Djamoos v. Djamoos*, 153 A.D.2d 871, 545 N.Y.S.2d 596 (1989), a mother had conveyed her home to her son under circumstances in which "his name was placed on the deed purely as a convenience, and no one intended for him to receive sole beneficial interest in the home." Rather, it was proven that the Defendant promised to reconvey the house to her. There are numerous other examples of "reconveyance cases."

**21.** Thus, for example, it has often been said that no constructive trust "may be imposed by one who has no interest in the property prior to obtaining a promise that such an interest will be given to him." *In re Wells' Will*, 36 A.D.2d 471, 321 N.Y.S.2d 200 (1971).

**22.** For example, it has been said that a trial court erred in imposing a constructive trust where the record indicated that the Plaintiff never had any prior interest in the house in question, this in a case in which the Plaintiff had resided in the house for 30 or more years and had made contributions of mortgage, taxes, repairs and improvements, but where there was no evidence that there had ever been a promise to convey to him the house upon which he sought imposition of the trust. *Scivoletti v. Marsala*, 97 A.D.2d 401, 467 N.Y.S.2d 228 (1983).

**23.** "[Although] a party may not impress a constructive trust on realty absent the relinquishment of some interest in the parcel in reliance on a promise to convey, the law of constructive trusts ... is not confined to reconveyance situations.... The transfer concept extends to instances ... where funds, time and effort are contributed in reliance on a promise to share in the result." *Ladone v. Ladone*, 121 A.D.2d 512, 503 N.Y.S.2d 831 (1986).

And although another panel stated that "it must be shown that the party seeking to impose the constructive trust had some interest in the property prior to obtaining the promise that the promise would be conveyed," it held that when the plaintiff signed a purchase contract under which she was to purchase the real estate in question, she was "immediately vested with equitable title therein" so that when she relinquished the property interest in reliance on her sister's promise to reconvey, "the third element necessary to impress a constructive trust, to wit: a transfer in reliance on a promise, was established." *Lester v. Zimmer*, 147 A.D.2d 340, 542 N.Y.S.2d 855 (1989).

It seems to be particularly difficult to establish entitlement to the imposition of a constructive trust where the property sought to be so charged at all times remained property of the alleged trustee, and any benefit or "enrichment" gained by such trustee stems from improvements to the property,[24] and in the context of the case at bar, it is important to note that the issues before the Court would be no different if there had been no acquisition of a new home. The Plaintiff could well have transferred funds to the Debtor for expansion and improvement of his earlier home, rather than for the acquisition of the new one, and the issues presented to the Court would be identical. Indeed, it may be argued here that the Debtor fared worse from the acceptance of Plaintiff's largesse

than he would have fared had there simply been improvements to the old home. After sale of the old home he and his wife were netted $32,000 to devote towards the new home, but the sale of the new home by the Trustee, pursuant to the Order of this Court and the consent of the other interested parties, netted less than that amount.

Thus, if the Court were inclined to apply the rules set forth immediately above,[25] the Court would have no difficulty in doing so to the exclusion of the Plaintiff's claims. However, there is a more compelling reason to deny those claims.

The Court has been cited to no instructive case in which constructive trust is imposed upon property for breach of a promise that had nothing to do with the use or

---

**24.** To illustrate: A court was asked to examine a will under which a farmer had left his farm to his three sons and five daughters, despite the fact that his three sons (and not his daughters) had been "partners" with the decedent in the operation of the farm. The sons alone had purchased farm equipment and livestock with their own funds, and had been told by the decedent that he considered the farm operation to be "a four-way deal;" that the farm was "all theirs together," that he had bought the farms "for the boys" and that "the boys" owned the farms. The Court, affirming the denial of a constructive trust in favor of the three sons to the exclusion of the daughters, stated that

> "although the facts may reveal a case of unrealized expectations, we may not, without more, fashion a constructive trust. Decedent may well have had a moral obligation to give the property to objectants but such an obligation 'is not enough to set a court in motion to compel the devolution of property in a certain way.' A constructive trust has been imposed where property is parted with on faith of an oral promise, *but none may be imposed by one who has no interest in the property prior to obtaining a promise that such an interest will be given to him;* and, since objectant's performance of working the farm was not unequivocally referable to the oral agreement they now claim, the agreement would be void as violative of the Statute of Frauds.... There has been no transfer of property here resulting in unjust enrichment under cover of any confidential relationship. Decedent merely retained what was rightfully his and, of course, did not appropriate property which and, at any time, belonged to others. In short, the confidential relation relied upon by objectants was not, as required by well reasoned authorities, the procuring cause of the conveyances of the farms to decedent."

*In re Wells' Will* 321 N.Y.S.2d at 204.

Similarly, where a son had moved in with his parents in 1963 and claimed that he had made expenditures to improve and maintain the premises, and where there was evidence that his father, in the presence of others, continually told him that "this house is now yours," the Court nonetheless found that the record failed to indicate that he "had any prior interest in the subject premises which he conveyed to his parents in reliance upon their promise to reconvey. Moreover, his expenditures to improve and maintain the subject premises may be satisfactorily explained by his desire to improve the surroundings in which he and his family live. Likewise, the fact that he made mortgage, tax and other payments on the property during the time he resided there could be considered as rent for the use of the property. Although the appellant's father and his mother, the conservatee, may have in fact intended that he have the house, 'courts have uniformly held that a constructive trust is a fraud-rectifying remedy rather than an 'intent enforcing' one.' " [Citations omitted.] *Lefton* 553 N.Y.S.2d at 785.

For an example of the doctrine that "no constructive trust may be imposed by one who has no interest in the property prior to obtaining a promise that such an interest will be given to him," in a non-real estate context, see *Mance v. Mance,* 128 A.D.2d 448, 513 N.Y.S.2d 141, 143 (1987).

**25.** To reiterate in a fashion stated in yet another case, the rule provides that "in order to establish that there was a transfer in reliance on the promise, it must be shown that the parties seeking to impose the constructive trust had some interest in the property prior to obtaining the promise that the property would be conveyed, and that this interest was parted with in reliance on the promise." *Bontecou* 477 N.Y.S.2d at 195.

disposition of the property or the proceeds of such property. In the case at bar, the Plaintiff claims that Joseph was to receive a "life estate" in the house, but no evidence supports this claim. The Plaintiff testified that she had no expectation of receiving any interest in the subject property at any time, either for herself or Joseph. Her expectation, by her own testimony, was only that *wherever the Debtor might be living at the time of the Plaintiff's death,* the Debtor would take Joseph to live with him. The funds that she transferred were not intended, nor were they applied, to develop this real estate specifically for Joseph's use. At no time was there any discussion, impression, or understanding, tacit or otherwise, that she or Joseph would have any "estate" in these lands or even in the proceeds of these lands if they were to be sold by the Debtor and his ex-wife in the normal course. Her claim that Joseph was to have a life estate is wholly unfounded.

Thus, unlike any of the constructive cases cited to or discovered by the Court, the land upon which the Plaintiff seeks to impose a constructive trust is incidental and perhaps irrelevant, to the promise upon which she claims to have relied.

It indeed appears true that all but $1,000 of the funds she claims to have transferred for the purpose of improvement of the house were in fact used for that purpose. There is, consequently, an unequivocal nexus between the real estate and the money with which she parted. However, there is no such nexus between the real estate and the alleged promise which the Court will assume she elicited. Assuming for the sake of argument that she did indeed transfer $38,000 of her own money to the debtor and his ex-wife, how would the situation be different had she empowered them to utilize those funds to satisfy all other indebtedness so that they would be sufficiently credit-worthy to acquire the new house? This Court thinks that the situation would not be different. Her equitable claims would be the same. However, in either instance those equitable claims do not give rise to a constructive trust, for the critical element (given the absence of fraud) of there being a real or implied expectation of an interest in land underlying both the giving and the receipt of the funds was lacking.[26]

In short, the Plaintiff wants her money back. She never sought or expected any interest in the land, for herself or for Joseph. Her claim of constructive trust on behalf of Joseph is, therefore, specious. What she really asks is that she be treated as if she has a security interest in the real property to secure the monies she parted with on the basis (she asserts) of the promise. This leads to discussion of the final claim—her claim of an equitable lien.

The notion that the underlying promise must, in the absence of fraud, be one which is specific to the land clearly is as essential to a claim of an equitable lien as it is to a claim of constructive trust. It was a requirement easily met in those cases in which a promise to convey the land was clearly present, but in which the Courts believed that a prior interest was necessary to imposition of a constructive trust: thus, an equitable lien was awarded up to the value of the consideration paid for the promise, but a constructive trust on all or a portion of the fee was denied,[27] unless there was no proof of a promise to convey.[28]

A major distinction between constructive trust and equitable lien, then, is that there need be no prior interest in the land as to the latter. Another distinction is that there often need not be any confidential or fiduciary relation as to the latter. Further, as to the latter there need not be any promise as to the use or disposition of the property and there need be no "unjust enrichment." But the Courts have un-

---

**26.** The imposition of constructive trust as a remedy for actual fraud is subject to different analysis; that is a "fraud-rectifying device" that may be independent of "promises."

**27.** See, for example *Petrukevich v. Maksimovich,* 1 A.D.2d 786, 147 N.Y.S.2d 869 (1956); *Leary v. Corvin,* 181 N.Y. 222, 73 N.E. 984 (1905).

**28.** See, for example, *Scivoletti v. Marsala,* 97 A.D.2d 401, 467 N.Y.S.2d 228 (1983).

equivocally held that "The existence of an equitable lien requires an express or implied contract concerning specific property wherein there is a clear intent between the parties that such property be held, given or transferred as security for an obligation ... [Even] an agreement, either by parol on in writing, to pay debt out of a designated fund does not operate to create an equitable lien upon the fund...." [29]

Even if all inferences were to be drawn in favor of Mrs. Kelly, there was *at the most*, an implied agreement between the Debtor and his Mother-in-Law that if the time came that he could not or would not perform his promise to take care of Joseph, and if the house were to be sold, he would repay her from the proceeds. Even those circumstances would not give rise to an equitable lien on the house or on the proceeds thereof.[30]

In all, then, as to Mrs. Kelly's claims it must be said that the law does not compensate every instance of failed expectations, however sorrowful the events or the results.

## CONCLUSION

The claims of Mrs. Kelly on her own behalf and as Natural Guardian of Joseph Kelly are dismissed on the merits, as are the claims of Peter Mascaro Construction Co., Inc.

The Debtor's exemption shall be paid over to him from the proceeds of the house. The non-exempt proceeds of the sale are general assets of the estate. This Adversary Proceeding is closed.

SO ORDERED.

29. *Datlof v. Turetsky,* 111 A.D.2d 364, 489 N.Y.S.2d 353, 355 (1985) and cases cited therein.

30. *Datlof, supra.*