### In re RAMA GROUP OF COMPANIES, INC.
### Debtor

No. 00–12654 K.

United States Bankruptcy Court, W.D. New York.

April 27, 2001.

Order Quantifying Equitable Lien May 16, 2001.

William F. Savino, Beth Bivona, of counsel, Damon & Morey, Buffalo, NY, for Gottesman Company.

Raymond L. Fink, Harter, Secrest & Emery, Buffalo, NY, for Debtor–in–Possession.

Donald P. Sheldon, Buffalo, NY, for the Creditors' Committee.

## BACKGROUND

MICHAEL J. KAPLAN, Bankruptcy Judge.

This is a Creditors Committee challenge to a business broker's claim that its "finder's fee" is entitled to payment out of proceeds of the sale to the buyer it produced. The sale was post-petition. The production of the buyer was pre-petition. The Committee seeks to relegate the "finder" to general, unsecured, prepetition status.

Although both the brokerage agreement and the purchase and sale agreement contemplated payment of the fee upon closing, the Court permitted the sale to go ahead without payment to the finder, but "without prejudice" to the finder's rights.[1]

This matter directly asks "what does that mean?" The Court holds that qualifiers like "without prejudice to," "subject to the rights of," "with reservation of," etc. may have very distinct and different meanings. "Without prejudice to" party X does not necessarily mean "without prejudice to

---

1. More precisely, the finder's counsel stated, "Just to say the obvious, Your Honor. The [Gottesman] Company is not objecting to the procedure today, but we are doing that on the understanding that the order that comes out ... will ... reflect that those monies are taken subject to whatever claims there may be against them, whether by lien interest, encumbrance, or otherwise." [Transcript of June 13, 2000 proceedings, p. 13, lines 15–21.] And the Court replied, "... I'm ruling that any approval of these terms and conditions are without prejudice to any and all claims that [Gottesman] may have to proceeds." [*Id.* 13, lines 23–25, pg. 14, lines 1.]

the rights of X, such as they are, and such as a later objector might later establish X's rights to be." It may at times be error for the court to permit irreversible matters to go forward "without prejudice to" party X, without clearly stating that "this means without prejudice also to adverse interests who might later think up ways to challenge your claim, after the 'heat is off.'" And if that error is made, it may be inequitable for the Court to correct the error (perhaps even if the error was elicited by clever counsel).

It is useful to consider first a non-analogous context that highlights a certain quandary. This writer wrote for the Panel in the B.A.P. decision in *In re Pappas*, 215 B.R. 646 (2nd Cir. BAP 1998). In that case a creditor sought an extension of time to file a dischargeability complaint and the request was granted. The debtor then sought and was granted leave to appeal that interlocutory decision. He did not, however, seek to stay the extension ruling pending appeal. By the time the appeal was heard, the creditor had filed a complaint that was "timely" under the extension that was argued to have been erroneously granted.

The Panel dismissed the appeal as "equitably moot." No fair relief could be granted to the debtor/appellant if he were to prevail. He was seeking the striking of the dischargeability complaint, but that relief could not fairly be granted because the creditor/appellee had simply relied on an order that was not stayed.

Now the important point, for purposes of the present case. If the B.A.P. had ruled in the debtor's favor on the merits but had not adopted the "equitable mootness" standard, and had granted the relief sought—striking of the "late-filed" complaint—the creditor would have ended up worse off than if it had lost the original request to extend the time to file the complaint. Had it lost, it could have asked for just an hour in which to immediately file the complaint, for example.

When a creditor is ruled against on some issues in a bankruptcy case, it often has a panoply of rights in addition to the usual rights to seek review and to seek stay pending review. A creditor may object to proposed dispositions of property, may object to the claims of others (or seek to subordinate specific other claims), may seek to remove a debtor from management and control of assets, etc. Brinksmanship sometimes yields positive results.

But what does a creditor do if the Court says, "Don't worry. I will let this go forward 'Without Prejudice' to your rights?"

In the *Pappas* case, what was the successful creditor to have done once it succeeded in getting the time extended? Was it supposed to file a new Motion asking "Do you really mean it, Your Honor? Are we really safe if we file a Complaint before the date you set even though the Debtor says he's going to seek review?"

In the present case, what was the finder to do? Was it to say, "Do you really mean it? Might we be better off with a ruling that says that our claim of a right to be paid at closing is 'rejected'? Is your ruling 'Without Prejudice' only to us, or is it 'Without Prejudice' to anybody who shows up later to take potshots at our claim?"

Hence this writer offers the suggestion that sometimes a party suffers what might be called "the curse of the ruling that is not clearly adverse."

Given the high quality of representation in any given case (this case included) a court cannot rule-out the possibility that a willingness to accept a "without-prejudice" ruling might be a tactic to parlay such willingness into an eventual "win" from an otherwise losing cause.

This writer accepts that possibility and, as explained below, will endeavor not to repeat any mistake that otherwise might be ennobled by the result here. In the future it will be made clear whether or not "without prejudice" means not only "without prejudice to you, the claimant," but also (in a particular context) "without prejudice to any objections to your claim that someone not currently in court might later raise."

## "EQUITABLE LIEN" ANALYSIS REQUIRES RULING FOR THE "FINDER"

█ As noted at the outset, the "finder" produced the buyer; the Chapter 11 petition followed; the Court permitted the sale to go ahead "without prejudice" to the "finder's" claim for the contractual fee, which otherwise was to have been paid "on closing." The "finder" never suggested that it would not accept such a ruling, as explained below.

The "finder" is Gottesman Company.[2] At page 14 of Gottesman's "Brief in Support of the Imposition ...," it cites a New Jersey bankruptcy case (*In re L.D. Patella Construction Corp.,* 114 B.R. 53 (Bankr. D.N.J.1990)) as persuasive authority for the granting of an equitable lien in favor of a pre-petition broker. That decision in turn cites two other New Jersey cases. In the case of *Cohen v. Estate of Sheridan,* 218 N.J.Super. 565, 528 A.2d 101 (1987), a lower New Jersey State Court analyzed an earlier New Jersey Supreme Court decision in the case of *Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 236 A.2d 843 (1967) holding unequivocally that at common law, the right of a real estate broker to a commission to be paid at closing is entitled to the protection of an equitable lien on the property of the seller until closing (to protect against any unscrupulous activity on the part of the seller) and, after closing, to an equitable lien on the fund that is owed to the seller.

The common law principle from which this flows is the maxim that

> [E]quity regards as done that which ought to be done in fairness and good conscience ... [E]quity will treat the subject matter, as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been.... [T]he court has the power to compel the parties to do that which ought to be done and which was contemplated by the parties at the time of the transaction.

> Equity imputes an intention to fulfill an obligation. Where an obligation to perform an act rests on one who has the means of performing it, *that person* will be presumed to intend to perform through such means, and usually will not be permitted to show the contrary.[3] [emphasis added]

Of course, bankruptcy did not exist at common law and so common law does not address the arguments that creditors of "that person" might make. Even so, these persuasive authorities may be a sufficient basis upon which to recognize an equitable lien where, as here, there is no dispute that in fact the "finder" was responsible for the creating of the fund (as opposed to the case, for example, of a mere "exclusive sale" listing in which a listing broker did not in fact produce the buyer).

---

**2.** Not only has the Debtor uniformly recognized that Gottesman produced the buyer, but the President of the buyer, Bernard Bradpease, also so testified on June 30, 2000.

**3.** 27A Am.Jur.2d, Equity § 116 (1996) [case authorities omitted].

But this Court will not rest on those grounds.[4] Rather, the Court prefers to rule under recognized principles of New York Law as applied to this unusual case. This Court finds that the elements necessary to establish an equitable lien in favor of Gottesman under New York Law all arose *after*, not *before*, the Chapter 11 filing of RAMA.[5] And Gottesman is correct in pointing out that the Creditors' Committee's arguments based on such provisions of the Bankruptcy Code as § 365, § 327, and on cases such as *In re Keren Limited Partnership*, 189 F.3d 86 (2nd Cir.1999) are irrelevant. An encumbrance on property of the estate or upon proceeds of property of the estate is precisely that—an encumbrance. Whether the encumbrance is a pre-petition encumbrance or an encumbrance granted by the Court post-petition, such encumbrances have nothing to do with the assumption or rejection of executory contracts under § 365, the appointment of professionals to represent the estate under § 327, or allowance of administrative expenses under § 503.

Day in and day out this Court grants encumbrances of various sorts to various parties upon property of the estate. It is done to provide "adequate protection" under § 361, for example. It is done to permit sales free and clear of liens, with liens to be shifted to other property, under § 363. It is done when other Code provisions require it to be done, such as Code provisions governing confirmation of plans.

The thrust of the Committee's argument in these regards is that the only way that a pre-petition unsecured creditor can acquire a post-petition lien or elevate its status to administrative expense status is through the operation of the provisions that the Creditors Committee cites and under the cases that the Creditors Committee has elected to discuss. This thrust is rejected.

When this Court approved the sale in this case, it did so under 11 U.S.C. § 105 and § 363. Under 11 U.S.C. § 105(a) this Court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, and this Court finds that the *quid pro quo* for an equitable lien under New York Law inexorably emerged from the unusual process this case followed after its filing. Under the imprimatur of this Court, there arose "an express or implied [arrangement] concerning specific property wherein there [was] a clear intent [among] the parties that such property be held, given, or transferred as security for an obligation."[6]

At the time that the Court approved this process, the Court was not aware that the Gottesman claim could be disputed in any regard other than computation of amount and allocation as among the Debtor and several non-debtor affiliates. Indeed, in an in-chambers conference in which the body of unsecured creditors was presented

---

4. It must be emphasized that even if the Court were to rule that an equitable lien exists because of the principles cited by the New Jersey courts, that would have no bearing on the amount of the lien. Since the remedy would be equitable, the amount of the lien would also be decided by equity, and not by the terms of the contract.

5. Gottesman alleges that the buyer and the seller colluded to cheat Gottesman out of its fee. Of course, if this were to be established

as fact, the analysis set forth in *In re Religa*, 157 B.R. 54 (Bankr.W.D.N.Y.1993) would have no application; it was recognized in the *Religa* case itself that fraud rectifying devices such as trusts *ex malaficio* are governed by an analysis different from that presented in *Religa* where no wrongdoing was alleged by anyone with regard to Mr. Religa.

6. *Datlof v. Turetsky*, 111 A.D.2d 364, 489 N.Y.S.2d 353, 355 (2nd Dep't 1985), and cases cited therein.

by the Assistant U.S. Trustee, this writer asked why the sale should not proceed under § 365, and was told by Debtor's counsel that it was thought to be unwise to proceed under § 365 because if, for any reason, the Debtor could not perform after assumption, the Buyer's damage claims would become an administrative expense. There was no hint or suggestion from anyone present that the § 365 route was thrown out so as not to risk being compelled to assume the Gottesman agreement as part of the "package."[7] This was important. It is well known that this writer has a long-standing custom and practice of making sure that a "broker" is not "stiffed" by a bankruptcy process that permits others to reap the fruits of her labors. The usual procedure is a debtor's or trustee's Motion not only to sell property but also to pay the broker's fee or finder's fee as a "closing cost." This writer constantly approves these as "tantamount" to a § 365 assumption of the brokerage agreement, or as "tantamount" to recognition of an equitable lien or other charge upon the property.

With benefit of 20–20 hindsight, this Court should not have presumed in the present case that all of the conceivable challenges were "on the table," and should not have permitted the completion of the Asset Purchase Agreement without first addressing § 365 and § 327 and any other pertinent statutes. But the fact that the Court may have erred does not mean that Gottesman loses. The Court ruled that the Asset Purchase Agreement—which referenced the Gottesman agreement that called for Gottesman to be paid at closing—could be performed without paying Gottesman but "without prejudice" to Gottesman's rights. Gottesman had a

right to rely on this assurance. To this writer, the connotation was that Gottesman would not fare worse than it would have fared had it insisted on payment at closing and suffered an adverse ruling, so that it could have appealed, seeking to stay the sale pending appeal. In light of the fact that there is no argument about the fact that Gottesman produced the buyer, there can be little doubt about the fact that Gottesman would have been successful in achieving some settlement with the Committee that would be better than what the Committee seeks now that the assets are sold—relegating Gottesman to pre-petition, general unsecured status.

Doctrines of finality such as "law of the case" exist solely because some erroneous decisions must be permitted to stand. For this Court to have given Gottesman assurance that it would fare no worse for its forbearance in the computation and allocation of its fee may have been a mistake in light of the fact that there was not yet a Committee Counsel to raise the issues it might raise, and the fact that neither this writer nor the U.S. Trustee's representative were prescient enough to foresee the argument now being advanced. As for this writer, it will not happen again that the respective positions, hypothetical or otherwise, will not be addressed in the decision to proceed "without prejudice." But as to this case, it was the Court's clear intent that Gottesman was to be secured by the fund its efforts generated, and the sale went ahead on that basis.

## CONCLUSION

Gottesman has an equitable lien. The amount, however, remains subject to challenge. Gottesman's Motion is restored to

---

7. It is possible that someone else in the in-chambers conference has a different recollection. But if there was any indication that the priority of Gottesman's claim could be challenged, this writer either did not hear it or missed the significance of the indication.

the Calendar for **May 9, 2001 at 10:00 a.m.** for further argument in that regard.

SO ORDERED.

█ Consistent with this Court's earlier decision, this matter is back before the Court for quantification of Gottesman's equitable lien. A number of alternative theories and arguments were placed on the record in open court on May 9, 2001, and the Court will not reiterate them in this decision.

After considering all of the arguments, the Court now states the issue to be this: At what dollar amount may it be said that there is no "unjust enrichment" of either Gottesman or of the creditor body?

The Court finds the answer in the form agreement used by Gottesman Company. In that agreement, Gottesman uses a schedule of fees which, though not a model of clarity,[1] seems to provide that in a transaction in excess of $10 million (and this, of course, was a transaction for less than $10 million) the Gottesman fee would be 5 percent of the first $10 million plus 4 percent of the excess above $10 million up to $20 million, and then 3 percent of the excess above $20 million up to $30 million, plus 2 percent of the excess over $30 million up to $40 million, plus 1 percent of any amount over $40 million. Taking a $100 million. transaction, then, for illustration, one sees that Gottesman would receive 2 percent on a $100 million sale: to wit, $500,000 on the first $10 million, $400,000 on the second $10 million, $300,000 on third $10 million, $200,000 on the fourth $10 million, and $600,000 on the last $60 million. That is a $2 million fee on a $100 million transaction, which equals 2 percent. Thus, in response to Gottesman's counsel's rhetorical question when Gottesman of-

fered to take $275,000 in full satisfaction of its claim, "Who gets less than 5 percent?" the answer is "Gottesman gets less than 5 percent on its larger deals."

Focusing only on the RAMA-owned assets sold by RAMA, this was a $5 million transaction. By the fee schedule, that would be $100,000 for the first $1 million and $200,000 for the last $4 million. That is a $300,000 claim, equaling 6 percent of the $5 million selling price.

Of the $5 million, only about $800,000 was netted for unsecured claims, and that amount is subject to attorneys fees and other administrative expenses yet to be determined.

There is no hint or suggestion that Gottesman ever acted in bad faith toward unsecured creditors of RAMA—Gottesman appears to have been completely "shut out" of dealings that led to a drop in purchase price that is blamed on an Internal Revenue Service investigation, and that brought RAMA from a price at sale that would have left it solvent, to a price at sale that left it grossly insolvent.

Secured creditors enjoyed the benefits of a sale that left them whole, while what is left will pay only priority tax debt and pennies on the dollar for trade and certain other tax debt. Also, certain affiliates of RAMA obtained personal benefits from the sale, though no one has yet suggested that this came at the expense of RAMA's creditors.

So this Court views the present matter strictly as a matter between Gottesman and RAMA's non-priority, unsecured creditors. In light of this Court's analysis in the case of In *re Cardon Realty,* 172 B.R. 182 (Bankr.W.D.N.Y.1994), regarding the fact that bankruptcy does not change the

---

1. Compare the schedule with the statement of how trustee commissions are to be computed under 11 U.S.C. § 326.

274

unwise, injudicious, or even frivolous decisions that pre-bankruptcy management made (although principals may be held liable to the estate where appropriate under law), the Court concludes that Gottesman is entitled to an equitable lien in the amount of $199,000.

That allowance is comprised of two parts. The first represents half the difference between 2 percent (charged by Gottesman on a $100 million transaction) and 6 percent (charged on transactions of just under $10 million). Three point .five percent of $5 million is $175,000. The second element is $24,000 representing the fact that this was a transaction as to which the Gottesman agreement provided for a $50,000 bonus on the first million dollars of a smaller (less than $10 million) transaction.

This amount would appear to be fundamentally fair and equitable as to Gottesman because it falls in the middle range (as a percentage) of what Gottesman is willing to accept as to larger deals, and also provides half of the "kicker" that Gottesman contractually obtains on deals of less than $10 million.

And the amount appears to be fundamentally fair and equitable to the general unsecured creditor body because this amount is at least $100,000 less than what Gottesman had a right to obtain had this sale occurred and had Gottesman been paid prior to, rather than after, the Chapter 11 filing. Moreover, $199,000 is slightly less than a quarter of the $800,000 remaining after satisfaction of the secured claims: that is not unduly large, in this writer's opinion, nor is it outside the range of what Gottesman reasonably could have obtained had the Court insisted (as addressed in this Court's earlier decision) that Gottesman's rights be adjudicated or settled before the Court would allow the

performance of the Asset Purchase Agreement.

The Debtor may pay $199,000 to Gottesman in satisfaction of its equitable lien. Gottesman may file an unsecured pre-petition claim for the balance of anything it believes to be owed by RAMA.

SO ORDERED.